SCHERMERHORN OIL CORPORATION, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 103049.

SCHERMERHORN-WINTON COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 104204.

CHARLES WELDON TOMLINSON, PETITIONER, *v.* COMMISSIONER OF INTERNAL. REVENUE, RESPONDENT.

Docket No. 100663.

Promulgated January 23, 1942.

*George H. Abbott, C. P. A.,* and *L. Karlton Mosteller, Esq.,* for the Schermerhorn Oil Corporation and Schermerhorn-Winton Co., petitioners.

*Ezra Dyer, Esq.,* for Charles Weldon Tomlinson, petitioner.

*John E. Marshall, Esq.,* for the respondent.

154

OPINION.

Mellott: Under the applicable provisions of the Revenue Acts of 1934 and 1936, the Schermerhorn Oil Corporation and the Schermerhorn-Winton Co., hereinafter sometimes referred to as the Schermerhorn companies, are allowed deductions for depletion of oil and gas properties either: (a) on the basis of 27½ percent of the gross income from such properties not exceeding 50 percent of the net income; or (b) on the basis of cost, whichever is greater. Secs. 23 (m) and 114 (b) (1) and (3), Revenue Acts of 1934 and 1936.[1]

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions:

    *        *        *        *        *        *

(m) DEPLETION.—In the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under rules and regulations to be prescribed by the Commissioner, with the approval of the Secretary. * * *

SEC. 114. BASIS FOR DEPRECIATION AND DEPLETION.

    *        *        *        *        *        *        *

(b) BASIS FOR DEPLETION.—

(1) GENERAL RULE.—The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113 (b) for the purpose of determining the gain upon the sale or other disposition of such property, except as provided in paragraphs (2), (3), and (4) of this subsection.

    *        *        *        *        *        *        *

(3) PERCENTAGE DEPLETION FOR OIL AND GAS WELLS.—In the case of oil and gas wells the allowance for depletion under section 23 (m) shall be 27½ per centum of the gross income from the property during the taxable year, excluding from such gross income an amount equal to any rents or royalties paid or incurred by the taxpayer in respect of the property. Such allowance shall not exceed 50 per centum of the net income of the taxpayer (computed without allowance for depletion) from the property, except that in no case shall the depletion allowance under section 23 (m) be less than it would be if computed without reference to this paragraph.

In their income tax returns for the taxable years the Schermerhorn companies deducted, in computing net income for those years, allowances for depletion on each of the oil and gas leases acquired upon the recommendation of Tomlinson. In some instances the amount deducted was based upon a percentage of the gross income and in others upon cost. The corporations also deducted as general expenses, and in one instance (the return of the Schermerhorn Oil Corporation for 1937) excluded from income, the payments made to Tomlinson and his assigns during the taxable years. Respondent disallowed the claimed expense deductions and exclusions from gross income and determined that the payments should have been capitalized. This resulted in increasing the corporations' respective gross incomes but allowed them larger cost bases for the purpose of computing depletion based upon cost under the statutes referred to above.

Petitioners' alternative contention ((b) as set out in the statement of the issues) may be considered first. It is that 10 percent of the gross income and 10 percent of all expenses from the oil and gas producing properties acquired upon the recommendation of Tomlinson should be excluded in computing the net taxable incomes of the Schermerhorn companies. They argue that the payments were simply transferred by the corporations to the rightful owners without any effect upon the capital or income of the corporations (which will be considered more fully in connection with the discussion of (a), i. e., whether they were capital transactions), since the agreements between them and him constituted a joint venture and since, regardless of how the contracts may be construed, Tomlinson had, with respect to each property, "a right in the nature of a *thing in action* * * * from the moment such properties were acquired." They insist, in other words, that Tomlinson or his assigns held a 10 percent economic interest in the properties.

Petitioners' contention that a joint venture existed is not sound. An agreement to share profits is not of itself sufficient to create the relationship. "There must be some additional fact such as control over or proprietary interest in the subject matter involved or a share in the risks and burdens incident to the transaction or transactions to be carried forward, showing that the parties intended the relationship." *Alfred M. Bedell,* 9 B. T. A. 270; affd., 30 Fed. (2d) 622. Each joint adventurer must have some voice and right to be heard in the control and management of the joint venture. *Hughes* v. *Baker,* 169 Okla. 320, 327; 35 Pac. (2d) 926. The agreements between Tomlinson and the companies provided that he should have no voice in determining whether properties recommended by him should be purchased, sold or abandoned or in the operation or man-

agement of such properties. He could not bind or obligate the Schermerhorn companies under any contract with third parties, except when authorized in writing to do so, nor could the companies bind him or his portion of the net profits. There was no provision in the agreements that he should have an interest in any oil or gas lease, as in *Shoemake* v. *Davis*, 146 Kan. 909; 73 Pac. (2d) 1043, cited and relied upon by petitioners. He was given merely an interest in the net profits of leases recommended by him, and acquired, operated, and developed by the Schermerhorn companies. Neither of the companies ever caused a partnership return to be filed, treating Tomlinson as a joint adventurer, nor did he ever cause any such return to be filed. (Secs. 187 and 801 (a) (3), Revenue Act of 1934.) Evidence of an intention to create a joint venture is entirely lacking and in our opinion no such relationship was in fact created.

Petitioners' contention that Tomlinson had, with respect to each property acquired under the agreements, a right in the nature of a "thing in action", is based primarily upon the Oklahoma statutes.[2] They argue that it was personal property, the ownership becoming "completely fixed in all respects with reference to a particular property the moment such property was acquired under the agreements"; that, being personal property, the income derived from it was his, rather than the corporations'; and that the provisions of the contract under which the corporations retained exclusive control over the property and its development were "no more than a mere carving out of the parts of the whole which constitute the separate properties of each  *  *  *." The same thought is expressed in a query contained in their brief on this phase: "What do the Schermerhorn companies acquire when they transfer that which is produced by property which is owned by Tomlinson or his assigns?"

The statutes upon which petitioners rely are of slight, if any, aid to them. They seem to do no more than provide for assignment and survivorship of a chose in action. If considered as an attempt by the state to classify such a right as Tomlinson had under the agreements they are not applicable; for until a dispute arose or a breach occurred, neither of which has been shown, no "right to recover money or other personal property by judicial proceedings" arose. As we view the facts Tomlinson had a mere contractual right to a percentage of the net profits produced by certain leases. This was a right to receive income if and when realized; but he had no economic

---

[2] A thing in action is a right to recover money or other personal property, by judicial proceedings. (60 Okla. St. Ann. 312.)

A thing in action, arising out of the violation of a right of property, or out of an obligation, may be transferred by the owner. Upon the death of the owner, it passes to his personal representatives, except where, in the case provided by law, it passes to his devisees or successors in office. (60 Okla. St. Ann. 313.)

interest in the property producing the income. The property was "acquired by First Party"—the oil corporation—and Tomlinson, under the contract, was merely its "representative." In other words the contract was a contract of employment or limited agency and the net profits were paid for services rendered.

Petitioners' further alternative contentions (issues (c) (1), (2), and (3)) may be considered next. They have been set out above in substantially the language used by petitioners upon brief. Epitomizing the contentions and the arguments made in support of them, petitioners claim they are entitled to deduct from gross income 100 percent of the amounts paid to Tomlinson in addition to deducting depletion based upon the cost of the properties or $27\frac{1}{2}$ percent of the gross income. They contend that such was the method approved by this Board in *North American Oil Consolidated*, 12 B. T. A. 68 (reversed upon other issues, 50 Fed. (2d) 752; 286 U. S. 417). In that case the petitioner had agreed to pay its attorneys 4 percent of the oil, gas, and other minerals produced from certain property in the event the attorneys were successful in accomplishing a satisfactory termination of court and land office proceedings relating to the property. The proceedings were successfully terminated. It was held that the payments to the attorneys were capital expenditures and that depletion was allowable in respect of such amounts. They were not held to be deductible either as ordinary and necessary business expenses, general overhead expenses, or direct overhead expenses. It was stated:

* * * The solution that seems to us will produce a proper result is to allow as depletion in each year an amount equal to the 4 percent paid to the attorneys. By this method, when eventually production ceases, the petitioner will have returned to it through the depletion allowances exactly the amount of its capital expenditure and the depletion deduction each year will be reasonable.

Petitioners' interpretation of the decision, that it allowed the deduction in the year in which the payments were made, either as ordinary and necessary business expenses in the nature of a depletion deduction or as an item of general or direct overhead expense, is erroneous. In addition, it may be pointed out that the tax years involved in the cited case were 1917, 1918, and 1919 and the revenue acts relating to those years contained no alternative provision for percentage depletion such as is now contained in section 114 (b) (3), *supra*. Petitioners are entitled, under the above statute, to a depletion allowance based either upon cost or upon $27\frac{1}{2}$ percent of the gross income from the property, whichever is greater. It is obvious that, if petitioners should be permitted to deduct from the gross income of the property the 10 percent of the net profits paid to Tomlinson and also $27\frac{1}{2}$ percent of the gross income from the prop-

erty, they would thus secure a double deduction for depletion.[3] No double deduction for depletion was ever contemplated by the statute.

The principal issue is whether the Commissioner committed any error in treating the payments to Tomlinson as capital expenditures. As pointed out above, the *North American Oil Consolidated* case, *supra*, treated comparable expenditures as capital expenditures. This, we think, was proper. It has been pointed out that the contracts between Tomlinson and the oil companies were either contracts of employment or of limited agency. Under them the companies were permitted to acquire oil and gas leases, explored by Tomlinson, in consideration of the payment to him of a salary and drawing account and in consideration of the additional payment to him of 10 percent of the net profits from the property after deducting the original cost or after the companies had reimbursed themselves from the profits on the first oil sold for all of the expenses incurred in acquiring and developing the property. The obligation to make the additional payments to Tomlinson was just as much a part of the cost of acquiring the leases as the consideration which the companies agreed to pay to the lessors. It arose when the properties were acquired, the time of payment being postponed until net profits should be realized. If the companies had convenanted to pay Tomlinson certain lump sums at the time of the acquisition of each property, it would perhaps be more obvious that such payments were made in connection with the acquisition of a capital asset; but there is no substantial distinction between such payments and those which the corporations covenanted to make. As we view them they are somewhat analogous to commissions paid in connection with the purchase of property, ex-

---

[3] Respondent incorporates in his brief a computation of net income based upon an assumed gross income from a leasehold costing $100,000 with an expected recoverable oil reserve of 1,000,000 barrels and a net production for the year of 100,000 barrels. Column 1 seems to be as petitioners would compute it while Column 2 indicates respondent's method of computation.

|  | Col. 1 | Col. 2 |
|---|---|---|
| Gross Income | $100,000 | $100,000 |
| Deductions, including ordinary overhead, operating expenses and depreciation | 10,000 | 10,000 |
| Net Income before Depletion | 90,000 | 90,000 |
| 50% of Net Income | $45,000 | $45,000 |
| 27½% of Gross Income | 27,500 | 27,500 |
| Cost Depletion to be considered in applying the limitation provisions of sec. 114 (b) (3): |  |  |
| (a) Computed on leasehold cost | 10,000 | 10,000 |
| (b) Computed on Capitalized Net Profits | None | 9,000 |
|  | 10,000 | 19,000 |
| Allowable Depletion under Sec. 114 (b) (3) | 27,500 | 27,500 |
| Additional Depletion (Issue (c) (1)) | 9,000 | None |
| Total allowable depletion | 36,500 | 27,500 |
| Net Taxable Income | 53,500 | 62,500 |

162

penditures made for surveys, abstracts of title, or geological opinions, and amounts paid in defending or perfecting title to real estate, all of which have been held to be capital expenditures. *Helvering* v. *Winmill*, 305 U. S. 79; *Seletha O. Thompson*, 9 B. T. A. 1342; *Moynier* v. *Welch*, 97 Fed. (2d) 471. The mere postponement of payment until the realization of net profits does not change the nature of the expenditures, nor is it material that the payments made in the later year do not add to the property interest previously acquired. The test is whether the expenditures are made in connection with the acquisition or preservation of a capital asset. If so, they are capital expenditures. Applying this test we think that the payments in issue were made in connection with the acquisition by the Schermerhorn companies of the properties from which the net profits were realized. We are therefore of the opinion and hold that the respondent properly treated them as capital expenditures.

The conclusion which has been reached accords with the view recently expressed by the Board in *Quintana Petroleum Co.*, 44 B. T. A. 624 (promulgated June 3, 1941, later reviewed by the Board and adopted November 11, 1941). In that proceeding petitioner, like the oil corporations before us, was under obligation to account to the Gulf Production Corporation for a portion (one-fourth) of the net proceeds from the operation of leased property. The total production of oil from the lease during 1937 was $46,895.65. In its income tax return for that year petitioner claimed and was allowed percentage depletion of $12,896.30, representing 27½ percent of its gross income from the property. In addition it claimed a deduction of $7,142.28, being the amount paid out in its agreement with the Gulf Production Co. It was held that the payment constituted a part of the consideration paid for the lease, was a capital expenditure and not an expense payment.

The issue in Docket No. 100663 involves $7,882.21, this amount being 10 percent of the net profits realized in 1937 from leases and properties acquired by the Schermerhorn Oil Corporation upon Tomlinson's recommendation. It was paid to Tomlinson's wife and included in her gross income in the separate return which she filed. The Commissioner determined: "that the principles enunciated in *Lucas* v. *Earl*, 281 U. S. 111; *Van Meter* v. *Commissioner*, 61 Fed. (2d) 817, and *Gerald A. Eubank*, 39 B. T. A. 583 govern." He accordingly added the amount to the net income shown in Tomlinson's return, made other adjustments not now in issue, and determined the deficiency in tax.

Petitioner Tomlinson contends "that the interests acquired by him under his contracts of employment in the particular properties were vested interests in the property"; that the contract right to receive the profits was a vested property right, assignable by him; that the

income was derived by his wife from the property interest conveyed to her; and that the respondent erred in including it in his income.

Since the deficiency in issue was determined the Supreme Court has affirmed the holding of the Board in *Gerald A. Eubank, supra* (*Helvering* v. *Eubank*, 311 U. S. 122); decided *Helvering* v. *Horst*, 311 U. S. 112; reexamined its decisions in *Blair* v. *Commissioner*, 300 U. S. 5, and the line of cases stemming from *Lucas* v. *Earl, supra;* and said:

> The power to dispose of income is the equivalent of ownership of it. The exercise of that power to procure the payment of income to another is the enjoyment and hence the realization of the income by him who exercises it. (*Helvering* v. *Horst, supra.*)

It is true that the owner of a legal or equitable interest in property may assign it and "the one who is to receive the income as the owner of the beneficial interest is to pay the tax." *Blair* v. *Commissioner, supra.* If the "interests acquired by petitioner under his contracts of employment * * * were vested interests in the particular properties" they would be assignable and the income would be taxable to the assignee. We do not believe, however, that petitioner had, or that he attempted to assign to his wife, a vested property right. As pointed out above the contracts between him and the oil companies were contracts of employment or limited agency and an agreed percentage of the net profits was to be, and was, paid for services rendered. The payments were not unlike those made to Eubank and his wife (*Gerald A. Eubank, supra*). Nor does the fact that the contracts of employment permitted Tomlinson to sell, assign, or transfer "his pecuniary interest in any specific property acquired pursuant to" the contracts of employment have the effect of making his "pecuniary interest" a vested property right. Having rendered services which resulted in the development by the oil companies of properties which were being operated at a net profit, he undoubtedly had a pecuniary interest which could be assigned; but it was still compensation for services which he had rendered and hence, as we view it, governed by the principle of *Lucas* v. *Earl, supra*, and kindred cases. We therefore hold that the Commissioner did not err in including it in Tomlinson's income.

Tomlinson makes the alternative contention that if it should be held he is subject to tax upon the income of $7,882.21, then he should be allowed a depletion deduction with respect to this income and also with respect to income received by him in 1937 in connection with the Kloh lease and the Phillips royalty. We do not agree.

A deduction for depletion is allowable only to the individual or corporation having a capital investment in the oil and gas in place. Tomlinson had no such investment. Under his contracts he was entitled to receive 10 percent of the net profits from certain leases

and properties acquired upon his recommendation. In *Anderson* v. *Helvering*, 310 U. S. 404, the Supreme Court said:

\* \* \* A share in the net profits derived from development and operation, \* \* \* does not entitle the holder of such interest to a depletion allowance even though continued production is essential to the realization of such profits. *Helvering* v. *O'Donnell*, 303 U. S. 370; *Helvering* v. *Elbe Oil Co.*, 303 U. S. 372.

Respondent did not err in refusing to allow the claimed depletion.

*Decision in each docket will be entered under Rule 50.*